**In re CARMANIA CORP. N.V., Debtor.**

**Bankruptcy No. 91–B–12048 (CB).**

United States Bankruptcy Court, S.D. New York.

April 8, 1993.

See also 154 B.R. 160.

Edward J. Shapiro, Bradford F. Englander, Martin W. Flics, Amy E. Chambers, and Alan Bushlow, of Latham & Watkins, New York City, for Carmania Corp. N.V. ("Debtor").

Adam B. Gilbert, Jonathan D. Kantor, and Eric P. Wainer, of Shea & Gould, New York City, for creditor ABN AMRO Bank N.V. ("Bank").

Jennifer Boylan, Thomas B. Kinzler, of Kelley Drye & Warren, New York City, for Victor Shafferman and Drummond & Hill.

### MEMORANDUM OF DECISION ON DETERMINATION OF VALUE OF 15 WEST 47TH STREET

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

The future course of these proceedings hinges on the value of 15 West 47th Street, Debtor's primary asset. Value is at issue in Bank's pending motions for relief from the automatic stay, for dismissal of the Chapter 11 case, and for appointment of a trustee. If Debtor survives Bank's motions, the valuation question will be a central issue in consideration of its proposed Plan. Accordingly, during the course of the trial on Bank's motions, we advised the parties that we would bifurcate hearing of the various motions and determine initially only the value of the building. The value we arrive at in this Memorandum of Decision will be used in our subsequent determination of the issues remaining in connection with Bank's motions, and, if Debtor's reorganization survives, in proceedings on the proposed Plan. Bank and Debtor have each submitted appraisals into evidence and have rigorously cross-examined each others' appraisers. Not surprisingly, the appraisal each offers serves its own purposes, and the two diverge widely in their conclusions as to value. Bank contends for a value of $24.3 million, relying on the $26.7 million value arrived at in its appraisal and the $24.3 million its appraiser ultimately testified to after being forced by the facts to revise his opinion. Debtor's

appraisal and its appraiser stand fast for a value of not more than $15 million. We find that the market value of 15 West 47th Street is $15 million.

■ The parties have devoted considerable effort to disputing which appraisal method is appropriate. While both agree that the income approach to valuation is to be preferred in these circumstances over the market and cost approaches, they disagree as to how to apply the income approach. Bank contends for the "discounted cash flow" method, described in its appraisal as follows:

> The cash flow is projected for 11 fiscal years. The first 10 years of cash flow are discounted. The eleventh year is capitalized to estimate the reversionary value and then it, too, is discounted. The sum of the discounted values is the market value.

Bank's Exh. 62, 66. Debtor argues that we should rely instead on "direct capitalization," a method by which "a stabilized.net income is divided by an appropriate rate to arrive at an indicated value." Debtor's Exh. FF, 69.

■ We are persuaded that not much of consequence hinges on which of the two methods is chosen. Each method is intended to arrive at the same result—the market value of the subject property.[1] The two methods are merely alternative structures within which to quantify problematic guesses about the future. Far more important in determining value than which of the two methods is used, is the quality and reasonableness of the financial assumptions which are plugged into either. That point is illustrated here by the fact that each of the parties has offered evidence to show that when assumptions it deems correct are plugged into the method used by the other the value resulting is consistent with the value determined by its own preferred method.

■ Accordingly, we have focused on the reasonableness of the assumptions on which each side relies. From that focus, a consistent pattern emerged. During the course of the trial on this matter, which generated a transcript totaling almost 2,000 pages, we had repeated opportunities on numerous discrete issues, to observe the credibility and methodology of the opposing appraisers, as the parties fought over almost every assumption that either made. We reject the testimony of the Bank's appraiser in its entirety. We do not believe that he believes much of what he testified to. The objective evidence, much of which he provided, contradicted and undermined his assumptions, many of which were so "implausible on [their] face that a reasonable factfinder would not credit" them. *Anderson v. City of Bessemer*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 529 (1985). We find the testimony of Debtor's appraiser to be credible. His testimony was fair and reasonable, and his assumptions were consistent with the objective evidence available. Accordingly, we find the market value of 15 West 47th

---

1. We note that our statutory purpose here is not to determine market value, but to value the Bank's "interest in the estate's interest in such property." 11 U.S.C. § 506. See generally, Queenan, *Standards for Valuation of Security Interests in Chapter 11*, 92 Com.L.J. 18, 31 (1985) ("largely ignored [is] the fact that it is the creditor's security interest in the collateral that is to be valued"). Both parties' appraisers define "market value" in substance as the price that would be agreed to between a willing buyer and willing seller after a reasonable period of exposure in a competitive market, with each party fully informed and acting prudently in its own self interest. Debtor's Exh. FF, 5; Bank's Exh. 62, 8. See also, *In re Coated Sales, Inc.*, 144 B.R. 663, 667–668 (Bkrtcy.S.D.N.Y.1992). A secured creditor, however, is not in the position of a willing seller, but must incur the costs of fighting through an unwilling debtor, and then dispose of the property under somewhat less than ideal conditions. Thus, the value of the secured creditor's interest is invariably less than the market value of the property. This fact is well illustrated by the body of caselaw arising out of attempts by debtors to avoid pre-petition foreclosure sales as fraudulent conveyances because the distressed sale price was substantially less than market value. See cases collected in *In re Brown*, 104 B.R. 609 (Bkrtcy.S.D.N.Y. 1989). For post-petition valuation of a real estate mortgage, see, Queenan, supra, 92 Com.L.J. at 53, 59–63 ("valuation of a real estate mortgage should be at retail less projected costs of sale"). Because the parties failed to present evidence on this issue, our determination of value is as to market value, and to that extent is to Bank's advantage.

Street to be $15 million as of the valuation date.

In the discussion which follows, we will sample some of the discrete issues which arose during the course of this trial to explain why we have chosen to disregard the evidence of Bank's appraiser and credit the evidence provided by Debtor's appraiser. The record is filled with numerous other examples which could have been sampled instead. A major area of controversy between Bank and Debtor centers on the appropriate level of operating expenses. Debtor's appraiser assumed that annual operating expenses would total $3,455,000. Debtor's Exh. FF, 68. That assumption, divided by the building's net rentable area of 116,556 feet, *Id.*, at 7, yields total expenses of $29.64 per square foot.[2] "Very" critical to Bank's appraiser's valuation is his assumption that annual operating expenses could be trimmed by more than $500,000 annually. Tr., 836. This assumption contributed several million dollars to his estimate of value. *Id.* His methodology, however, is so flawed as to suggest that his primary concern is not to discover the market value of the building but to defend the value required by his client's interests. Examples abound. He testified that his analysis of other properties was one of the most important bases for his conclusion that expenses could be lowered, *Id.*, specifically citing information about other properties found on page 62 of his report. Tr., 836–37. That information consists of a table, labeled "Other comparable property expenses," that appears in context to summarize the range and averages for specific expense categories experienced by other properties. Bank's Exh. 62, 62. Counsel for Debtor noted that the numbers in the table on page 62 were in fact inconsistent with the information attributed to specific comparables in other sections of the report, whereupon the following rather remarkable exchange took place among counsel and this Court:

> DEBTOR'S COUNSEL: Your Honor, . . . I think they are phantom numbers, and the witness should be precluded from relying upon them in his testimony here.
> BANK'S COUNSEL: I will accept that.
> THE COURT: You accept that?
> BANK'S COUNSEL: Yes.
> DEBTOR'S COUNSEL: Your Honor, so the record is clear, is the bottom chart on Page 62 stricken from the record?
> BANK'S COUNSEL: I accept that.
> THE COURT: It is stricken.

Tr., 838–39.

With respect to the specific expense information gathered about specific buildings used as comparables, Bank's appraiser conceded, and we find, that:

—Debtor's building is a premium high-end building at the upper end of the buildings serving the diamond and jewelry district. Tr., 644–45, 839–40.

—The properties he identified as comparable to Debtor's building varied widely in terms of quality, age and physical characteristics. Tr., 839. Unlike most competing properties, the building contains both a vault area with safe-deposit boxes, and an exchange floor retail area. Tr., 841–49.

—All expense information for the comparables was one to three years old, and costs had increased for the current year over the prior years for which he had information. Tr., 858.

—A vault and exchange each entail operating expenses over and above those associated with ordinary retail space. Tr., 852–57.

—Of the 10 properties identified as comparable, only three had both a vault and an exchange. Tr., 841–49.

—Bank's Appraiser's report indicates that total actual current year operating expenses for Debtor are only about 15

---

2. Our computation of the $29.64 figure is for comparative purposes only, and actually overstates expenses somewhat, because Debtor's appraiser apparently excluded some or all of the vault area from his computation of net rentable area, but included expenses associated with the vaults in the total expense calculation. Debtor's Exh. FF, 36, 68. If we divide total expenses by the 125,158 net rentable square footage used in Bank's appraisal, expenses drop $2 per square foot to $27.61.

percent greater than the average of his ten comparables for prior years, without adjustment for inflation, despite the fact that most of the comparables did not have both vaults and exchanges, and are of lesser quality. Bank's Exh. 62, 56–57. —Of the three competing high-end properties in the district, Bank's appraiser considered only one, 580 Fifth Avenue. Tr., 840–41. That building is almost three times the size of Debtor's building and is able to achieve economies of scale in its operating costs that are unavailable to Debtor, Tr., 842–43, and has no expenses associated with operating either an exchange or a vault. Tr., 842. Yet its operating costs for a prior year were not significantly less than Debtor's costs for the current year. Bank's Exh. 62, 56–57.

We conclude that the cost assumptions of Bank's appraiser are utterly unreliable and without merit. The assumptions of Debtor's appraiser, by contrast, are fair and reasonable in light of the fact that the building is of premium quality, includes both a vault and an exchange, and requires aggressive management in a highly competitive market in a time of economic downturn.

Upon cross-examination, Bank's appraiser was forced to concede that his appraisal overstated the square footage of the second floor, which led in turn to overestimating the rental income that could be generated, leading, ultimately, to his conclusion as to the value of the building as a whole being $1.7 million too high. Tr., 660–81, 702–704, 816–17. In testimony several days after his error was brought to light, Bank's appraiser testified:

> I revisited the second floor as a result of the square foot question, and I went back to the building and I realized that I left out a component of income that deals with all of the second floors on the block and the second floor in the subject property.
> Second floor in the subject property has showroom windows, and a further check … indicates to me that there is a showroom potential on the second floor which

is different than all of the above floors, and I have re-analyzed the situation. Tr., 805–06.

Upon re-analysis, Bank's appraiser concluded that second-floor space could be configured to rent for a premium not originally included within his appraisal, allowing him to recoup $1.1 million of the value lost as a result of his error in computing second-floor square footage. The net result of the error and re-analysis was the $24.3 million value for which the Bank now contends. Debtor's cross-examination, however, disclosed, and we so find, that Bank's appraiser had no basis for his re-analysis. Bank's appraiser conceded that he did not consider the idea of reconfiguring the second floor to generate higher rents until after his error in computing square footage had been discovered. Tr., 817. Bank's appraiser testified:

> I checked the other second floors on the streets. They get higher rents for the second floor, *substantially*, than they do for upper floors.

Tr., 807 (emphasis added). In fact, Bank's appraiser had only surveyed two other buildings at the time he committed himself to the results of his re-analysis. Tr., 821–22. Because neither comparable supports the conclusion as to value he reached, we conclude that Bank's appraiser was grasping for a result. One of the two, 55 West 47th Street, he used as a "concept" only, not as a rent comparable. Tr., 826. The reason for this distinction seems fairly obvious. Bank's appraiser assumes that the second floor of Debtor's building could be rented for $50 to $55 per square foot beginning in 1995, after current leases expire and the space is reconfigured. The second floor tenant at 55 West 47th Street, however, paid rent at the time of the appraiser's testimony which was in the low $30 per square foot range. Tr., 827. Thus, 55 West 47th Street is a most unsatisfactory rent comparable. Accordingly, Bank's appraiser used 580 Fifth Avenue as his rent comparable, Tr., 826, testifying that the average rent for current leases of window space fronting on 47th Street at that building is $55 per square foot. Tr., 831. He conceded that his information about that figure came from another appraiser who

read him 10–12 current rents, Tr., 832–33, and that he had no written information to confirm that figure. Tr., 834. As a review of the transcript will show, Bank's appraiser's testimony about what he was told by someone else inspires not confidence, but concern, as to both his credibility and his methodology. Tr., 831–34. The best evidence in the record of rents for second-floor space at 580 Fifth Avenue is an actual lease which showed a then current rent of $45 per square foot, which had actually been modified downward from $48 the previous year. See Debtor's Exh. II, BB, CC. Bank's appraiser testified that the rents at 580 Fifth Avenue are generally higher than at the subject property, Tr., 1017, and that rents in newer buildings, including 580 Fifth Avenue, range from the mid $30's to low $40's per square foot. Tr., 1024. Bank's appraiser contended that it was the existence of showroom windows that added value to the second floor space. Tr., 805–06. The conclusion that second-story windows have showroom value is rebutted not only by common sense, but by the objective evidence. As Bank's appraiser acknowledged, rents for interior space without windows at 580 Fifth Avenue were the same as for those with windows. Tr., 1042. Moreover, leases at 580 Fifth Avenue were usually for three years, Tr., 1010, while he assumed that the subject property would lease the reconfigured second-floor space for five-year terms. Tr., 1007–08. Similarly, he assumed that second-floor tenants would pay for a substantial part of alteration costs to prepare the space, Tr., 1015, while tenants at 580 Fifth Avenue do not pay such costs. Tr., 1016. We find Bank's appraiser's assumption that Debtor could get any premium, much less $55 per square foot, to be without any merit.

The same sort of result-oriented approach infects other areas of the Bank's appraiser's report and testimony. He assumed that the Building's mezzanine could be finished and rented out, without first ascertaining whether the space met applicable building code requirements, and without explaining why it would be worth doing so at a time of oversupply of similar space within Debtor's market area. Tr., 742–46. We are persuaded by the testimony of Debtor's appraiser that bringing the mezzanine into compliance with applicable building codes is "an awful lot of trouble to go through for an area where half the exchange space is vacant anyway." Tr., 1494.

The building contains about 1,000 vaults in its basement that are rented out almost exclusively to tenants. Debtor's Ex. FF, 49; Bank's Ex. 62, 47. The overwhelming majority are five inches by ten inches. Debtor's Exh. FF, 49. Only seven percent are now rented, Tr., 749, despite having been available for several years. Tr., 1488. Bank's appraiser noted in his report on the vault that, "The vault boxes are not marketed and will not appeal to the general public." Bank's Exh. 62, 47. "It is the appraiser's opinion," the report says, "that the supply of vault boxes far exceeds demand." Bank's Exh. 62, 48. The report concluded:

> The appraisers believe that it is unlikely, given the demand and supply of vault boxes on the block, that the subject will achieve even a 50 percent occupancy rate.

Bank's Exh. 62, 53.

In his testimony, however, Bank's appraiser assumed the unlikely. He testified that the vaults would be half-occupied within three years at an average rent of $600 annually, based on leases at the subject property and in comparable buildings. Tr., 749. In fact, however, a five-inch by ten-inch vault at the building rents for $300–$400 annually, often with a year's free rent as an enticement. Tr., 1486–87. Upon cross-examination, Bank's appraiser grudgingly conceded the obvious: his assumptions overstated rental income to the extent that existing leases provided for free rent and were for less than $600 per year. Tr., 762–66. Debtor's appraiser, by contrast, assumed in his appraisal that about one-third of the vaults could be rented for $400 each per year. We agree with his testimony that this estimate is indeed "on the full side," considering that the building's stabilized vacancy rate is just under 11 percent, Tr., 1621; the vaults have been available for several years, Tr., 1488; actual rent for the predominant vault size varies between $300–$400 annually, Tr., 1486; and the

short term leases frequently include a period of free rent, Tr. 1486–87. In comparing the assumptions of the two appraisers as to the issue, we find that Bank's appraiser assumes far more to his client's purpose than even the most favorable view of the evidence would permit. The assumptions of Debtor's appraiser, are, by contrast, significantly less to his client's advantage than a reasonable view of the evidence would permit.

The skewed, unrealistic assumptions of Bank's appraiser discussed above are not isolated instances pulled out of context. They are, rather, examples only of a pervasive disregard of reason in pursuit of a result. We found Debtor's appraiser to be credible. His assumptions were fair and reasonable, not overreaching, and were supported by the objective testimony. Accordingly, we reject the evidence offered by Bank's appraiser in his testimony and appraisal, and credit that of Debtor's appraiser. Based on the evidence set forth in the record as a whole, we find the market value of the subject property was $15 million as of Debtor's appraisal date.

Counsel for Debtor to settle an Order on five days' notice.