## In re VANDERVEER ESTATES HOLDING, LLC, Debtor.

No. 01–20348–608.

United States Bankruptcy Court, E.D. New York.

May 8, 2003.

Abraham J. Backenroth, Backenroth, Frankel & Krinsky, LLP, New York City, for Debtor.

Andrew C. Gold, Herrick, Feinstein LLP, New York City, for VE Apartments LLC.

## DECISION ON VALUATION

CARLA E. CRAIG, Bankruptcy Judge.

The matter before this Court is the determination of the value of the property known as Vanderveer Estates ("Vanderveer" or the "Property"), a multi-family low-income housing project which is the principal asset of Vanderveer Estates Holding LLC (the "Debtor"). Vanderveer consists of 59 contiguous apartment buildings containing 2,496 apartment units located in the East Flatbush section of Brooklyn. Vanderveer was placed under the control of a receiver prior to the commencement of this case and the receiver has continued in control of the Property with the Debtor's consent pursuant to § 543(d) of the Bankruptcy Code.

The purpose of this valuation is to fix the value of Vanderveer in connection with consideration of the Debtor's Fourth Amended Plan of Reorganization (the "Debtor's Plan") and the reorganization plan proposed by VE Apartments LLC ("VE"), the debtor's principal secured creditor. An evidentiary hearing on valuation ("Valuation Hearing") was held on November 8, 13, 22, 25, 26 and December 2, 2002, at which the Debtor introduced the testimony of two witnesses: its appraiser, Martin Levine of KTR Newmark Real Estate Services LLC; and Donald Hibbard of Building Diagnostics, Ltd., a licensed engineer. VE introduced the testimony of four witnesses: VE's appraiser, Robert Von Ancken; Susan Camerata, Vice President and Controller of Wavecrest Management Team ("Wavecrest"), the receiver's managing agent; Maryanne Schretzman, Deputy Assistant Commis-

sioner of the New York City Department of Homeless Services; and Charles Reyher of Emmes Realty Services, which services the mortgage held by VE.

The valuation of Vanderveer plays a pivotal role in this Court's consideration of the plans proposed in this case. This is so for several reasons. The Debtor's Plan proposes to pay the claim of the largest secured creditor, VE, pursuant to two alternative treatments. (See Debtor's Plan § 5.01; see also Debtor's Fourth Amended Disclosure Statement ¶ 32("Debtor's Disclosure Statement")) Under the first alternative, the Plan provides that Newco (a newly formed entity owned by Michael Konig, the Debtor's principal), will pay VE's claim pursuant to a new note and mortgage having a principal amount equal to VE's allowed secured claim, which is approximately $81 million, to be amortized over 25 years with interest at 5.5%, but maturing ten years after confirmation. (Debtor's Plan, § 5.01(b)) The Plan further contemplates that Debtor will refinance at the end of 10 years in order to make the balloon payment. (Debtor's Disclosure Statement ¶ 8) The Plan provides that, in the event this Court does not approve this treatment of VE's claim, VE may proceed with its foreclosure in state court and that its claim in that event will be treated as unimpaired. (Debtor's Plan § 5.01(c))

One of VE's principal objections to confirmation of this Plan is that it is not feasible, as it must be, pursuant to § 1129(a)(11) of the Bankruptcy Code, in order to be confirmed. (VE Apartments LLC's Objection to Confirmation of Debtor's Fourth Amended Plan of Reorganization ¶¶ 41–47) VE contends that, at the end of the initial ten years, assuming a valuation of Vanderveer of approximately $81 million at that time, Debtor would be unable to secure refinancing to pay off the $68 million balloon payment because an institutional lender would only lend a maximum of $57.2 million (approximately 70% of the $81 million value which VE's appraisal attributes to Vanderveer in 10 years). (Id. ¶ 44) In addition, VE contends that a foreclosure of Vanderveer, which is provided for as an alternative treatment of VE's claim under the Debtor's Plan, would generate insufficient funds to provide any distribution to the administrative, priority and unsecured claims, and that for this reason, too, the plan cannot be confirmed. See, e.g., § 1129(a)(9)(A) of the Bankruptcy Code (requiring payment in full of administrative claims upon confirmation); § 1129(a)(9)(C) of the Bankruptcy Code (requiring full payment of priority tax claims with interest over a period not exceeding six years.) (VE's First Amended Disclosure Statement in Connection with Second Amended Plan of Reorganization for Vanderveer Estates Holding, LLC ¶ 18) Furthermore, if the value of Vanderveer is equal to or less than VE's claim of $81 million, then the subordinate secured claim of Avery Eisenreich would be fully unsecured, and would be classified with other unsecured claims (which are being treated as unimpaired). Since Eisenreich's subordinate secured claim at this time represents the debtor's only impaired, potentially consenting class, the reclassification of this claim as unsecured would mean that the debtor would lack an impaired consenting class, a prerequisite to confirmation of this Plan under § 1129(a)(10) of the Bankruptcy Code.

VE and Debtor have each submitted appraisals into evidence and have cross-examined each other's appraisers. Not surprisingly, the appraisal each offers serves its own purposes, and the two diverge significantly in their conclusions as to value. Both appraisers modified their original reports twice before arriving at their final conclusions of value. In VE's first appraisal, submitted on February 26,

2002, VE's appraiser, Von Ancken, arrived at a value of $65 million.[1] Subsequently, Von Ancken revised his appraisal to increase the value of the Property to $72 million. This change was made to reflect consideration of three previously omitted factors: 1) the improvement in the vacancy and collection loss of Vanderveer from 15% to 5% due to the improved management of the Property by the receiver after she took control of Vanderveer in September 2001; 2) the actual expenses of Vanderveer for the full year subsequent to the receiver's appointment; and 3) the J–51 tax benefits to which the Property is entitled. On November 21, 2002, VE updated its second appraisal, increasing Vanderveer's value from $72 million to $75.5 million, to reflect that the parties stipulated for the purpose of valuation to annual operating expenses of $14 million and to an increase in the average rent for 198 units of Vanderveer, which currently participate in a program administered by the New York City Department of Homeless Services. Conversely, in Debtor's first appraisal, submitted on September 17, 2002, Debtor's appraiser, Levine, valued the Property at a higher figure, $110 million, and subsequently, principally due to changing assumptions regarding the subsidized rental income derived from Vanderveer, decreased his estimate of value in his second and third appraisals, to a final appraised value of $106 million.

■ The parties have devoted considerable effort to disputing which appraisal method is appropriate. Though both appraisals rely on the income approach, they employ different variants of that methodology. Debtor's appraiser, Levine, relied primarily on the direct capitalization approach, which arrives at value by taking an estimate of stabilized net operating income and applying an overall capitalization rate. (Tr. Nov. 8 pp. 33–40)[2] In addition, Levine employed a comparative sales analysis as a benchmark to ensure that the value derived from the primary approach was reasonable. (Tr. Nov. 25 pp. 80–81)

■ VE's appraiser, Von Ancken, employed a different variation of the income approach, the discounted cash flow method, which estimates the net cash flow of a property over 10 years and then discounts that amount by an appropriate discount rate to the present value.[3] It then estimates the reversion value of the Property, by predicting the value of the Property in the eleventh year and discounting that number to present value. The reversion value is then added to the discounted cash flow to arrive at a final value. (VE App. I p. 48) VE contends that the discounted cash flow method is appropriately used in this case in order to account for fluctuations in income resulting from the fact that certain sources of income will change over the course of a ten-year holding period. (Tr. Nov. 26 pp. 142–43) VE contends that the direct capitalization approach,

1. VE's appraisal reports will be referred to herein as VE App. I, II and III; the Debtor's appraisal reports will be referred to as Debtor App. I, II and III. The appraisal reports are in evidence as VE Exhibits 1, 2 and 25, and Debtor Exhibits A, G and H respectively.

2. The transcripts of the Valuation Hearing will be referred to herein as Tr. Nov. 8, Tr. Nov. 13, Tr. Nov. 22, Tr. Nov. 25, Tr. Nov. 26, and Tr. Dec.2, corresponding to the dates of the hearing.

3. "Discounting" is a general term used to describe the process of converting future cash flows into a present value. See "The Appraisal of Real Estate", Appraisal Institute, at 550 (12th Ed.2001) The discount rate represents the interest rate used for the discounting process, and takes into account risk and time value of money.

which assumes a stabilized or fixed level of income, cannot properly account for the fluctuating income in a property such as Vanderveer and is inappropriate. (VE Apartments LLC's Post–Trial Mem., p. 7) Von Ancken also differed from Levine in that he gave no weight to the sales comparison approach, based upon his belief that there are no truly comparable properties. (Tr. Nov. 26 p. 169)

■ At least as important as the methodology employed at arriving at market value is the "quality and reasonableness of the assumptions which are plugged into [either methodology]." *In re Carmania Corp.*, 156 B.R. 119, 121 (Bankr.S.D.N.Y. 1993) Moreover, evaluation of those assumptions is critical to determining the appropriate appraisal methodology. Accordingly, this opinion will first consider the reasonableness of the assumptions on which each side relies.

### Background

Before turning to the appraisals, it is useful to set forth certain facts regarding programs administered by the City of New York, through the New York City Housing Authority ("NYCHA") and the Department of Housing and Community Renewal ("DHCR"), to provide housing for homeless and low-income families. These facts, which are not in dispute, are essential to an understanding of the assumptions which underly the appraisals.

*Scatter Site Program*

The Scatter Site Program ("SSP") was created in 2001 as an emergency measure to house homeless families. Under the SSP, private organizations known as "providers" arrange with landlords to make a certain number of apartments available to DHCR for temporary emergency housing of homeless families. (Tr. Nov. 22 p. 90) Vanderveer participates in the SSP through the Sunshine Homeless Program ("Sunshine"), a provider which also supplies SSP housing at other locations. Of Vanderveer's 2,496 apartments, 198 are SSP units. (Tr. Nov. 22 pp. 91–92)

The most important fact about the SSP for valuation purposes is that landlords housing homeless families under this program receive a very substantial premium above the rents which would otherwise be chargeable for these units. The income generated by the SSP units at Vanderveer is $2,100 per unit, as opposed to the average stabilized rent of $680.00 per unit, exclusive of SSP units, for the other units at Vanderveer. (VE's Post–Trial Memo pp. 2–3)

Commissioner Schretzman testified that DHCR intends to phase out the SSP, reducing it by 500 units by June, 2003, and to eliminate it entirely by June, 2004. (Tr. Nov. 22 p. 94) Commissioner Schretzman also testified that DHS will not necessarily phase out the SSP proportionately. It is therefore possible that all the 198 SSP units at Vanderveer could be phased out in the first group of units that are to be eliminated by June 2003. (Tr. Nov. 22. p. 96)

Commissioner Schretzman also testified that because of its poor condition, Vanderveer would not be awarded replacement SSP units even if Vanderveer qualified for additional SSP units. (Tr. Nov. 22 pp. 104–105, 108–110) In August, 2002, due to an increase in the number of homeless families, and despite the plans to terminate the Scatter Site Program, DHCR expanded the SSP by 300 units, to a total of approximately 2,100 units, in a two-fold process. (Tr. Nov. 22 pp. 101–104) During the first phase, DHCR offered to allocate the first 100 units to providers who met "certain targets in expanding the Section 8 program." (*Id.* p. 102) Sunshine did meet these targets in this regard and was allo-

cated 15 additional Scatter Site units; however, these units were allocated to a Sunshine location other than Vanderveer. (*Id.*) The additional units were not allocated to Vanderveer due to "massive HPD violations at the buildings" and the overall poor conditions of the buildings. (*Id.* pp. 102–103) The second phase of the program provided that for every five SSP families placed in Section 8 apartments, the provider would receive a replacement of the SSP tenants as well as an additional five SSP apartments. (*Id.*) Again, Vanderveer could not qualify to receive these SSP units due to the condition of the buildings. (*Id.*)

*Section 8*

The Section 8 program is a federally funded housing subsidy program created to provide private, affordable housing to low-income families. Public housing authorities, such as the NYCHA and the HPD, apply to the federal government for Section 8 funds and subsequently award vouchers to eligible applicants, such as qualified homeless families. (Debtor Ex. "Pl") Pursuant to the Section 8 program, the Section 8 tenant is usually required to pay a certain portion of the rent, generally equivalent to approximately 30% of the tenant's adjusted income, and the remainder is paid by the government subsidy. (Debtor Ex. "Pl" p. 4; Tr. Nov. 8, p. 75; Nov. 22 p. 11; Nov. 26, p. 216) In order to benefit from the Section 8 program, a landlord must provide an apartment that is in accordance with the Housing Quality Standards (HQS) of the Department of Housing and Urban Development ("HUD"), and must have a Section 8 voucher tenant who is interested in renting that apartment. (Debtor Ex. "Pl"; Tr. Nov. 22 pp. 12–14) The HQS requires that a prospective Section 8 registered apartment meet certain criteria, such as possessing a functioning smoke detector, appliances in good condition, window guards, properly painted rooms, properly tiled floors, proper ventilation in the bathrooms, and the like. (Debtor Ex. "P1") Only after the apartment has passed the HQS inspection can it be offered to the prospective Section 8 tenant. (Tr. Nov. 22 p. 15) Section 8 vouchers are portable; Section 8 voucher holders are not required to accept housing offered to them, even at a qualified location, and are free to move at any time. (Tr. Nov. 22 p. 32)

*EARP*

The Emergency Assistance Rehousing Program ("EARP") is an incentive program administered by DHS to encourage the relocation of homeless families from temporary to permanent housing. Landlords who rent EARP-registered apartments to homeless families which have qualified for Section 8 vouchers and EARP certificates are entitled to receive one-time bonuses pursuant to EARP. (Debtor Ex. "N"; Tr. Nov. 22 p. 97) In general, the size of the EARP bonus corresponds to the size of the family; in order to receive an EARP bonus of $6,000, it would be necessary for a landlord to provide an EARP-registered apartment to a family of five holding an EARP certificate. (Debtor Ex. "N" p. 1) In order for an apartment to be registered for EARP, it must first qualify as a Section 8 apartment. (Debtor Exhibit "N" p. 2) In addition, the apartment must be free of HPD violations and current on real estate taxes. (Tr. Nov. 22 p. 16) An EARP apartment must be rented in accordance with EARP occupancy guidelines, which restrict the number of occupants who may be housed in an EARP apartment. (*Id.* pp. 99–103; VE Ex. 12) DHS has discretion to accept or reject any apartment for EARP registration, and may limit the number of EARP apartments in any building or neighborhood. (Tr. Nov. 22, pp. 97–99; Debtor Ex. "N") A landlord cannot rent an apartment to an

EARP tenant if that apartment has been rented during the past 12 months to a family receiving public assistance. (*Id.*; VE Ex. 13) Furthermore, if an EARP tenant vacates prior to the lease expiration, the landlord must return a pro-rata portion of the EARP bonus he had received back to the City or re-rent the apartment to another EARP tenant. (Tr. Nov. 22 p. 45)

### The Appraisals

We will now turn to a discussion of the parties' appraisals and the assumptions underlying them.

I. *Assumptions Concerning Income From Subsidized Housing*

A. *The Debtor's Appraisal.*

All three appraisals submitted by the Debtor assume that subsidized housing will provide a significant source of rental income. Vanderveer has 2,496 units, of which 198 participate in the SSP. In addition, Vanderveer currently has approximately 475 units which are occupied as Section 8 voucher holders. The SSP units rent at $2,100 per unit each month, a significantly higher amount than the average registered rent stabilized rent of other apartments at Vanderveer, which is $680.00.[4] In his first appraisal, Debtor assumed that the income from the SSP would remain in place "in perpetuity". (Tr. Nov. 8 pp. 39–40) This inclusion of SSP income resulted in Levine making the assumption for purposes of his direct capitalization analysis that Vanderveer would receive annually $33,684,210 of rental income more than the amount Vanderveer would earn in the absence of the SSP.

(VE's Post–Trial Memo p. 10; Tr. Nov. 8 pp. 33 and 39.) However, this assumption proved to be incorrect. Levine was forced to modify his appraisal as a result of Commissioner Schretzman's testimony at a deposition taken prior to the valuation hearing, in which she stated that DHS plans to completely eliminate the SSP by June 2004. (Tr. Nov. 8 p. 44; Tr. Nov. 22 p. 94)

In the second appraisal, submitted the day before commencement of the valuation hearing, Levine eliminated his initial assumption that SSP income would continue at Vanderveer, but concluded that Vanderveer could recoup almost all the loss of income from the termination of the SSP by renting, over the next 24 months, 600 additional units to tenants whose rent would be subsidized by the Section 8 program. (Tr. Nov. 8 pp. 62–64) In order to arrive at this conclusion, Levine assumed that the maximum rents under Section 8 was $1055 per unit each month, rather than $680 per unit, which is the maximum rent stabilized rent set by DHCR. (Tr. Nov. 8 pp. 46, 62, 79) Again, using a capitalization rate of 9.5%, Levine assumed Vanderveer would thereby replace approximately $28.5 to $30 million of the $33.7 million in value lost by the elimination of the SSP. (Tr. Nov. 8 pp. 65–66) Under this approach, Debtor's App. II valued Vanderveer at $106 million.

This valuation was based on two assumptions: first, that the maximum Section 8 rent chargeable at Vanderveer was $1,055 per unit and second, that it could actually lease 600 new units to Section 8 tenants in 24 months. This first assumption again proved to be incorrect, like Levine's assumption concerning the continuation of SSP income. Levine assumed that

---

4. The parties agreed that the current average DHCR registered apartment rent at Vanderveer is approximately $680.00 per month and that the average rent stabilized rent for the SSP units was $661.31 per month. (VE's

Post–Trial Memo pp. 2–3) The parties also agreed that the rent stabilization guidelines would permit an increase in the rent by 18%, to $760.50, if any SSP apartment were taken out of the SSP and leased to a tenant. (*Id.*)

Section 8 apartments at Vanderveer could be rented for $1,055 per month based on the NYCHA Section 8 Rent Schedule. On cross-examination, however, he was confronted with a letter from Gregory Kern, director of the leased housing authority at NYCHA (Tr. Nov. 8 pp. 86–90), stating that DHCR rent-stabilized rents control and serve as a cap on Section 8 rents so that the maximum rent realizable from Section 8 units at Vanderveer is the *lesser* of the maximum Section 8 rents and the rent-stabilized rents established by DHCR. Realizing the error underlying Debtor's App. II, Debtor stipulated to that fact, and Levine again revised his appraisal. (Tr. Nov. 13, pp. 3–12; VE's Post–Trial Memo, p. 4, fn. 9)

■ It is appropriate at this point to say a word about the credibility of Levine's appraisals. Levine repeatedly demonstrated ignorance of facts of crucial importance to his opinion on valuation. In addition to lacking knowledge of the fact that (as noted above) the New York City Housing Authority will not pay more than the DHCR registered rents for Section 8 tenants (a fact which had an enormous impact on the value of the Property), Levine also demonstrated a lack of familiarity with the EARP requirements restricting the number of people who can be housed per apartment, and therefore made the incorrect assumption that the SSP units (which are not subject to these occupancy restrictions) could be immediately converted into EARP units. (VE Ex. 12; *cf.* Tr. Nov. 25 pp. 72, 94–98) Despite his reliance on EARP units as an important source of income in his appraisal, Levine testified that he had no knowledge of the availability of EARP apartments at Vanderveer, or how many of those EARP apartments are occupied or vacant. (Tr. Nov. 25 p. 98) He also did not know that Section 8 vouchers are portable and that Section 8 tenants can

turn down eligible apartments. (Tr. Nov. 8 p. 74) In addition, he was unaware that Section 8 rent payments may be suspended if a building contains building or housing code violations, or if a tenant fails to re-certify eligibility for Section 8. (Tr. Nov. 8 pp. 92–94) Furthermore, Levine was unaware of the actual experience at Vanderveer in attracting and keeping Section 8 tenants and EARP tenants, or of the Section 8 collection loss at Vanderveer as it currently exists or as it has occurred historically and testified that his collection loss in Debtor App. II would have been higher had he been aware of collection loss problems for Section 8 units. (Tr. Nov. 8, pp. 91, 94–95 and 97; *cf.* Tr. Nov. 13, pp. 19–20) While these facts may seem somewhat technical, one would think that it is incumbent upon an appraiser who is basing his valuation on assumptions concerning the availability of income from various subsidized housing programs to (at a minimum) familiarize himself with the correct facts concerning those programs, and also to have some knowledge of the Property's actual experience in participating in these programs. His failure to inform himself of any of these matters shows a carelessness and a result-oriented approach that undermines the credibility of his assumptions and opinions generally.

With this in mind, we consider Debtor's App. III, prepared by Levine after the fundamental error underlying Debtor's App. II was pointed out to him. Recognizing that DHCR rent-stabilized rents are not high enough to sustain the valuation of the Property arrived at in Debtor's App. II, Levine apparently cast about for another means of increasing income. In Debtor's App. III, Levine assumed that it would be possible to increase the DHCR rent-stabilized rents in 600 units to equal the maximum Section 8 rents of $1,055, and that it would be possible to rent those units at that level. To obtain this result,

Levine was required to make three assumptions that cannot be accepted as reasonable or credible.

■ Levine proposed that the hypothetical prudent owner of Vanderveer would seek to raise the rents on 400 rent-stabilized units, as well as the existing 198 SSP units (as they are phased out of the SSP), by $312.50 (which is the difference between the DHCR rent-stabilized rents and the maximum Section 8 rents), by taking advantage of a provision of the Rent Stabilization Act which permits a landlord who makes certain types of qualifying improvements to a vacant apartment to increase the DHCR maximum rent for that apartment in perpetuity by an amount equal to 1/40th of the cost of the improvements.[5] (Debtor Ex. "M") In order to increase the rent by $312.50 it would be necessary for the owner to invest $12,500 in capital improvements in each of those units. (Tr. Nov. 25 pp. 65–66, pp. 67–68) Levine made the assumption that the hypothetical prudent owner would make this investment to achieve this rent increase. In making this assumption, Levine also assumed that these 600 apartments could be rented to Section 8 tenants—an assumption that is critical to his valuation, because the average market rent at Vanderveer is approximately $767 per month, approximately the same as the DHCR rent-stabilized rent (including the 18% vacancy allowance increase). (Tr. Nov. 22 pp. 55–56 and p. 35) It is highly unlikely that a tenant who is not receiving a Section 8 subsidy would be willing or able to pay a $300 premium above market for these apartments, and the debtor does not contend otherwise. (Tr. Nov. 26, p. 223)

Levine also made highly questionable assumptions about sources of funding for these improvements, assuming (without any support) that the capital improvements made by the Debtor two years ago to fix up the SSP units could be the basis for a 1/40th rent increase, and further assuming that $3.6 million of the $5 million renovation costs he assumed would be required would be recovered by renting these 600 units to Section 8 EARP tenants, and collecting a $6,000 payment per family placed in these apartments. (Tr. Nov. 25 pp. 68–69; Tr. Nov. 8 pp. 45–46; Debtor Ex. H)

Each of these assumptions proved to be seriously flawed. First of all, it is unreasonable to assume, as Levine did, that a hypothetical prudent owner of Vanderveer would invest $12,500 per unit simply to increase the DHCR rent-stabilized rents of the Section 8 maximum. First of all, there is no reason to assume that it would be possible to rent 600 additional units to Section 8 tenants in the next two years. The actual history of Section 8 tenancy at Vanderveer (of which Levine was completely unaware) underscores the dubiousness of this assumption. (Tr. Nov. 8 p. 94) Section 8 vouchers are portable (another fact of which Levine was unaware). The testimony of Susan Camerata, who manages Vanderveer for the receiver, describes the difficulties Vanderveer has experienced in attracting and keeping Section 8 tenants. Since September 1, 2001, Section 8 tenancy at Vanderveer has actually decreased from 538 units to 475 units.

---

5. Levine bases his assumptions regarding the potential income generated by Vanderveer on what a "hypothetical prudent owner" would do to "maximize revenue, minimize expense and yet maintain the property in a competitive position." (Tr. Nov. 8 p. 34) The "prudent owner" concept reflects the consideration, in appraisal theory, of the "Highest and Best Use" of the subject property, defined as the "reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." (Debtor's App. I p. 54)

This decline is due to a combination of factors: some Section 8 tenants have simply moved out, taking their portable vouchers elsewhere; others have been evicted for nonpayment; and some have failed to recertify with Section 8.[6] (Tr. Nov. 22 p. 32)

The Debtor attempted to make the case that the phase-out of the SSP increases the likelihood that Section 8 tenancy at Vanderveer will increase. (Tr. Nov. 8 p. 61; Tr. Nov. 25 p. 62) But this argument was not supported by the evidence. Although Commissioner Schretzman testified that DHS intends to phase out the SSP throughout the City of New York by transferring SSP families to permanent housing, transfers to Section 8 housing only represent one element of the strategy. (Tr. Nov. 22 pp. 110–111) Moreover, the tenants moving out of the 198 SSP units at Vanderveer into Section 8 housing would not necessarily be moved to Section 8 housing at Vanderveer, but could go to Section 8 units outside of Vanderveer. (Tr. Nov. 22 pp. 94–96)

Even if it were possible to rent 600 new units to Section 8 tenants, it is unreasonable to assume, as Levine did, that a "prudent owner" would invest $12,500 per unit in capital improvements. Charles Reyher of Emmes Realty Services, VE's servicer, testified that a full rehabilitation of the apartments in question could be accomplished for $6,977—little more than half of what Levine assumes would be spent. (Tr. Dec.2 p. 318; Tr. Nov. 25 pp. 121–122)

Moreover, the Receiver has already spent, on average, approximately $3,000 per unit to comply with HQS standards. (Tr. Nov. 25 pp. 121–122) In short, it is clear that these apartments do not require an investment of $12,500 a piece, even for a full renovation.

Levine testified that a prudent landlord would not necessarily limit the costs of renovations of an apartment to necessary improvements but rather would attempt to invest a minimum sum of $12,500 in the renovation of an apartment (for example, by installing better-quality appliances) in order to achieve the 1/40th rent increase. (Tr. Nov. 25 pp. 121–122; Tr. Nov. 25 p. 101) This assumption flies in the face of reality of conditions at Vanderveer, as Reyher's testimony makes clear. Reyher explained:

> The problem that you find in these types of apartment complexes is that when you go to turn in these apartments a lot of times your cabinets will be missing, your refrigerators will be missing. So then you're back to square one again. And once you already do the 1/40th, then you're kind of stuck for the months.

(See Tr. Dec. 2 p. 333) Reyher further testified:

> Do I want to put [improvements] here [at Vanderveer] where there's a very good possibility that this stuff is going to walk out the door? That is not a very

---

**6.** Levine was also unaware that collection loss, in connection with Section 8 units at Vanderveer, due to suspended Section 8 government subsidy payments was as high as 11%, even in November 2002, despite the Receiver's efforts to remedy the problem. (Tr. Nov. 22 p. 41; compare to Tr. Nov. 8 p. 95) The testimony of Gregory Kern, Director of Leased Housing and the New York City Housing Authority, was introduced by proffer, pursuant to stipulation, regarding suspension of Section 8 payments, including the fact that the average Section 8 unit violations is 15% annually, 15% of Section 8 units in New York City are experiencing suspension of government subsidized payments (which represent 70% of rent), and two-thirds of those units do not cure the violations which prompted suspension of payments, within 30 days. (Tr. Nov. 13 pp. 19–20) Debtor App. II, however, measured the collection loss at Vanderveer at 1%.

prudent decision, as far as I'm concerned.

(See Tr. Dec. 2 p. 335)

The Debtor contends that this Court should disregard Reyher's testimony and, furthermore, that the Receiver's costs to repair and upgrade certain items at Vanderveer should be disregarded as well due to the fact that the Receiver has handed over control of the maintenance and upgrade costs to VE, and because Reyher is an employee of Emmes Realty Services, VE's servicer. (Debtor's Post–Trial Brief on Valuation pp. 11–12) In essence, Debtor contends that both Reyher's testimony and the Receiver's expenses are controlled by VE, and that this Court should disregard Reyher's testimony and the Receiver's expenses for this reason. (*Id.* p. 11, ¶ 24) This argument has no merit, because the Debtor has failed to show any evidence of any impropriety by VE's servicer or the Receiver. In any event, Debtor has failed to produce any expert witness with respect to the amounts necessary to improve the apartments at Vanderveer and bring them in full compliance with HQS, but instead has simply relied on Levine's testimony that $12,500 should be spent on upgrading the apartments, solely to achieve the 1/40th increase in rent regardless of the actual amounts necessary to bring the apartments in compliance with HQS. (Tr. Nov. 25 p. 101) In contrast, Reyher's testimony concerning the expenses necessary to upgrade the apartments at Vanderveer was detailed and forthright.

Levine's assumption that the hypothetical prudent landlord would be able to fund the renovations by collecting a $6,000 EARP incentive payment for each family moved into Vanderveer proved to be equally flawed, and based upon a lack of understanding of the requirements of the EARP program and lack of knowledge concerning Vanderveer's experience in attracting and keeping EARP tenants.

First, Levine fails to recognize the risk involved in making the up-front $5 million investment. The proposed renovations must be completed before the apartments can be registered with the EARP program; moreover, all housing code violations (including building-wide violations) must be cured before an apartment can be registered. (Tr. Nov. 22, p. 16) Moreover, there is no guarantee that even after the renovations are completed and violations cured the apartments could be registered for EARP. DHS has discretion to accept or reject apartments for EARP registration, and reserves the right to limit the number of EARP apartments in a particular building or neighborhood. (Debtor Ex. "N" p. 2) As Commissioner Schretzman testified, the DHS has "discretion and reserves the right to limit [EARP] apartments in specific buildings and neighborhoods." (Tr. Nov. 22, p. 99)

Camerata's testimony made it clear that the actual recent experience in attracting EARP tenancy at Vanderveer has not been good. Of the 40 EARP registered apartments at Vanderveer, only 11 have been leased to EARP tenants since April, 2002 while 29 remain vacant. (Tr. Nov. 22 p. 19) Since August, 2002, of 43 potential EARP certified families who made inquires concerning housing at Vanderveer, including prior SSP tenants at Vanderveer, only 8 chose to take apartments at Vanderveer. EARP families turning down apartments at Vanderveer gave a variety of reasons, including that Vanderveer did not have the right size apartment and that they did not want to live in a "project". (Tr. Nov. 22 pp. 22–24) Notably, Levine did not have any knowledge of the current availability of EARP apartments at Vanderveer, or of how many of those EARP

apartments had been occupied or remained vacant. (Tr. Nov. 25 p. 98)

Moreover, EARP occupancy standards require minimum-sized apartments depending on the size of the family (another fact of which Levine was unaware), which would pose a significant impediment to housing Section 8 EARP tenants at Vanderveer, as the vast majority of apartments at Vanderveer are one and two-bedrooms. (VE Ex. 12) EARP occupancy standards thus eliminate as potential tenants at Vanderveer all EARP certified families of more than four persons (which is the maximum number that could be housed in a two-bedroom apartment) and prevent studios from being rented to EARP families at all. (VE Ex. 12; Tr. Nov. 22 pp. 99, 26 and 29) Indeed, it became clear on cross-examination that Levine based his assumption that 600 new EARP units could be rented at Vanderveer on the wrong occupancy guidelines. (Tr. Nov. 25 pp. 94–98)

Debtor acknowledges these facts in its Post–Trial Memorandum, yet still contends that, even without the EARP cost defrayment, a prudent owner of Vanderveer would invest the necessary funds to achieve the increase of the DHCR registered rents to the Section 8 maximum. (Tr. Nov. 25, p. 70, 79, 111–112; 113–114; Debtor's Post–Trial Brief on Valuation p. 9, ¶ 19 and p. 10, ¶ 21) This argument relies upon Levine's assertion, based upon his "contacts with DHCR, HUD, HDD and NYCHA" that there is a "tremendous demand for good Section 8 apartments." (Tr. Nov. 25 pp. 49, *Id.* at 113–114 ("Based upon my general understanding of the market and more specific discussions with people that I would consider to be aware of the market conditions as it relates to Section 8, the supply and demand shows that these apartments would be readily absorbed.")) Levine does not point to any

specific source of information which is the basis for this belief, but relies upon unsubstantiated generalizations, and the weight of his testimony must be discounted accordingly. Moreover, testimony concerning Vanderveer's actual recent experience with Section 8 tenancy makes it clear that, even if Section 8 apartments are in demand, Section 8 apartments at Vanderveer may not be. (Tr. Nov. 22 p. 34)

### B. *VE's Appraisal*

VE's appraiser, Von Ancken, made different assumptions concerning the availability of income from subsidized housing in calculating rental income. In VE App. III, Von Ancken estimated subsidized rental income at an average DHCR rent of $680 per unit for the average apartment, and at $780.34 for the SSP units, as those units leave the SSP program. (VE App III p. 49) In addition, Von Ancken factored in the income from the SSP, at $2,100 per unit, for an additional income of $3,421,440 for the first projected year, and reduced this income each year by one-quarter, to reflect the assumption that the SSP will be phased out over a four-year period. (VE App. III p. 49; Tr. Nov. 26 p. 143) Von Ancken's final appraisal report reflected some changes in the assumptions made in VE App. I and II. The final report reflects the reduction of the vacancy and collection loss rate from 15% to 5% under the receiver's management; reflects the parties' stipulation, for the purposes of the valuation hearing, that the Property's annual operating expenses are $14 million; reflected the impact of J–51 tax benefits (which Von Ancken had overlooked in his first appraisal report), and reflected an increase in the rent assumed to be collectible from the SSP units as they are phased out of the SSP from $680 to $780, factoring in the effect of DHCR regulations permitting an 18% increase in the registered rents as a vacancy allowance when an

apartment is re-rented. Throughout his appraisals, Von Ancken projected a 3% income increase each year, and a corresponding 3% expense increase each year (with a 4% real estate tax increase). (Tr. Nov. 26 pp. 149–150) In addition, Von Ancken estimated a gradual increase of garage occupancy, from 137 spaces in year 1 at an average rent of $90 per space, to 175 in year 2, 213 in year 3 and 250 in year 4, with corresponding increases in income. (VE App. I p. 50) Von Ancken also testified that approximately $5,000,000 should be set aside for medium and long-term repairs and maintenance and that approximately $5,000,000 should be spent immediately. (Tr. Nov 26 p. 161) After taking these projections into consideration, and applying the discounted cash flow method, Von Ancken's final estimate of value for Vanderveer was $75.5 million. (Tr. Nov 26 p. 164)

■ Von Ancken's assumptions concerning the income which may be realized by Vanderveer from subsidized housing are reasonable and supported by the evidence. It is undisputed that the SSP will be phased out, so it is necessary to assume, as Von Ancken did, that the additional income generated for Vanderveer by that program will not continue. Although Commissioner Schretzman testified that the SSP will be eliminated in two years, VE's appraisal assumes that the SSP income will be phased out over four years. Thus, Von Ancken built into his assumptions the possibility that the phase-out of the SSP may not go as quickly as DHS has indicated. Von Ancken appropriately declined to make the speculative and unsubstantiated assumptions that were the basis for Levine's conclusion that the SSP income would be largely replaced by Section 8 income. Von Ancken also appropriately employed the discounted cash flow method which provides a more precise valuation of a property (such as Vanderveer) with a changing income stream. As Von Ancken explained,

[The discounted cash flow method] is more precise and it's used in most of the appraisals of commercial buildings, such as office buildings and shopping centers because they have leases that fluctuate and there are differences going on in the expected income.

It's used in cases for apartment buildings where you expect changes in the income system.

[It's] the only method that I could use here to measure the fall off of the rents in net operating income over a three year period.

[M]any of the banks insist now for apartment buildings that you also include the discounted cash flow analysis. If you have a situation when you know that the income side is going to change over a period of time, then you should use this discounted cash flow analysis since it's the only appraisal tool that measures the actual value of a property where there is a change happening.

(Tr. Nov. 26 p. 159, lines 3–16, 20–25; p. 160, lines 1–13)

Von Ancken's determination that comparable sales, or gross rent multiplier comparisons, should not be given weight in valuing Vanderveer is also appropriate. (Tr. Nov. 26 pp. 169–170) Von Ancken explained that he could find "no real comparable sale" which would justify such an approach due to the fact that Vanderveer possesses many characteristics which distinguish it considerably from any other multi-family complex in the area. (*Id.*) First, Von Ancken explained that Vanderveer was in a "deplorable condition" based on the "major deterioration within [Vanderveer] itself", the rampant vandalism and the presence of drug trafficking. (Tr. Nov. 26 pp. 133–137) In fact, the compara-

ble sales used in Levine's appraisal were all located in "much better" neighborhoods. (*Id.* at 172–74) As Von Ancken explained:

Q: Do you think it was appropriate for Mr. Levine to use [Fresh Meadows] comparable?

A: No, not at all. I used to live right near it. It's gigantic apartment complex with a good mix of quality type tenants in the building. There's no deferred maintenance, no vandalism. The parks are viable parks. There's nothing ripped up in the parks. . . .

Q: What rating, A, B, C, or D would you give to Fresh Meadows?

A: That would be an A.

However, Vanderveer was given a D rating, the lowest possible rating. (Tr. Nov. 26 p. 176) Second, Von Ancken mentioned that the sheer size of Vanderveer, 2,496 units, made it unfit for comparison to other properties, which generally possessed approximately 100 to 130 units. (Tr. Nov. 26 p. 172) Von Ancken also pointed out that Vanderveer had a "tremendous amount of deferred maintenance", which would require a "great deal of repairs and maintenance that's necessary", unlike the comparable sales used by Levine, which did not have this problem. (Tr. Nov. p. 176) For this reason, Von Ancken testified, the adjustment for age and condition of a minus 5% used by Levine was "not realistic," and should have been much greater. (*Id.*) In addition, Von Ancken explained that the SSP at Vanderveer, although pro-

viding higher income than the other units, would nonetheless present a disadvantage to the landlord in that it can be terminated at the DHS's discretion, and that it is more difficult to get institutional financing due to the higher risk associated with Section 8 tenants than regular tenants. (Tr. Nov. 26 pp. 180–81) Third, Von Ancken refused to use the GRM, which Levine used in his appraisal, because the GRM, in order to be indicative of value, could only be used between properties with similar income/expense ratios, due to the fact that the GRM only reflects gross income.[7] (*Id.* at 182–183 and 185–187) Debtor, however, contends that the average GRMs of the 5 comparable sales it used hovered at approximately 5.5. and that a "GRM below 4 is virtually unheard of in Brooklyn" and thus a GRM of 5 would be applied to Vanderveer in estimating value. (Debtor's Post–Trial Brief on Valuation p. 22, ¶ 51.) GRM is only a very rough estimate, which depends a great deal on similarity of characteristics between the subject property and the comparable properties.

This Court agrees with Von Ancken that the sales comparison approach is not appropriate to use in valuing Vanderveer because of the lack of any sales of truly comparable properties. Debtor assumes that it can make adjustments to several factors to balance these differences, including a 45% downward adjustment in comparing Fresh Meadows to Vanderveer. (Debtor's Post–Trial Brief on Valuation p. 23, ¶ 54) Von Ancken stat-

7. GRM, Gross Rent Multiplier, is a tool sometimes used by appraisers in connection with a comparable sales analysis to compare the relationship between sale price and the gross income/rent of a property. In calculating GRM, the appraiser divides the sales price of the comparable property by its gross rent/income. The appraiser will then estimate the subject property by multiplying the actual income of the property by the multiplier in an attempt to determine the estimated sales price that can be obtained for the subject property. (Tr. Nov. 26 p. 181) The higher the multiplier, the greater the value of the property. Typically, an appraiser will assess the GRM of several comparable properties to the subject property in determining the value of the subject property under the sales comparison approach. (*Id.*)

ed that, if a comparative sales analysis were undertaken, it would require greater adjustments due to age, location, tenancy, physical condition of the property and other variables, than those made by Levine. (Tr. Nov. 26 p. 178) This Court declines to attach any weight to the value derived by Debtor using the sales comparison approach in its appraisal.

Debtor contends that the 1997 appraisal, undertaken by KTR Newmark Real Estate Services, indicated a value of $94 million in the context of the sale of Vanderveer in 1998 for $88 million, which was deliberately overlooked by Von Ancken in arriving at his estimate of value of $75.5 million. (Debtor's Post–Trial Brief on Valuation, p. 25, ¶ 58) Debtor argues that, due to the general rise of value of multifamily residential real estate, Vanderveer's value would only have increased since the 1997 appraisal. (*Id.*) In explaining why he did not consider the 1997 appraisal in estimating value, Von Ancken testified that the Net Operating Income in the 1997 appraisal was inaccurate, representing an inexplicably significant increase from the 1994–1996 period, and further that the expenses used in the 1997 appraisal were understated by a significant amount, and consequently the overall value arrived at in the 1997 appraisal was inflated and inaccurate. (Tr. Dec.2 pp. 289–90) In addition, Von Ancken explained that the 1998 sale actually supported a valuation of $71.4 million based on the actual amount of the mortgage. (*Id.*) Although the mortgage given was $67 million, Von Ancken noted that the mortgage included a $5 million capital expenditure fund which was to be held back in reserve, and a letter of credit for approximately $4.8 million, which therefore reduced the actual mortgage amount at risk from $67 million to $57 million. Using a loan to value ratio of 80%, Von Ancken concludes that the actual value of Vanderveer indicated by the 1998 sale was $71

million, not $94 million. (*Id.*) In any event, Von Ancken was not required to consider the 1998 sale in his appraisal, as it predates the current appraisal by more than three years. (Tr. Nov. 26 p. 252) For the reasons cited by Von Ancken, this Court declines to consider the 1997 appraisal and 1998 sale of Vanderveer in connection with the current valuation.

For these reasons, this Court adopts Von Ancken's assumptions concerning rental income at Vanderveer, as well as his discounted cash flow analysis, for the purposes of determining the value of the Property.

### C. *Other Assumptions*

The difference in valuation in the Debtor's and VE's appraisals also results from different assumptions made about the availability of rental income from the garage, and from different assumptions concerning the monies needed immediately to repair the Property (which both appraisers treat as a deduction from the value of the Property). This opinion will examine each of these issues in turn.

#### 1. *Garage Income*

Throughout all of Debtor's appraisals, Debtor estimates that Vanderveer can increase the garage occupancy from approximately 137 cars to 800 cars immediately, and thereby derive approximately $480,000 in gross income per year, at a monthly rent of $50 per space. (Debtor App. I p. 59) Currently, only one of the 5 garages is in operation, utilizing 137 spaces or 80% of the garage occupancy. (Tr. Nov. 8 p. 99) The other three garages are unfit for operation, and a fourth is not accessible due to occupancy by an illegal tenant. (*Id.* p. 34) Even assuming that all the garages were repaired and made operational, it is not reasonable that the occupancy rates pro-

jected by Debtor would be achieved immediately. In support of Debtor's assumption regarding garage occupancy, Levine testified that, in his experience, "very rarely do you find a multi-family building in New York City that has a garage that is not always full" and that "to pay $50 a month to get your car off the street is a good deal." (Tr. Nov. 8 pp. 99–100) Such unsubstantiated generalizations do not lend much support to Debtor's assumptions. The explanations, which he later confirmed at trial, given for his projections of garage occupancy at Vanderveer at his deposition were likewise lacking in evidentiary support:

Q: So tell me again how you came to the conclusion that 800 spaces would be used at Vanderveer if they were available?

A: Based on the observation that off street garage parking in all the other facilities is seldom vacant, mostly utilized throughout Brooklyn.

Q: Did you ask Grenadier whether or not there was any demand for parking spaces at Vanderveer?

A: Well, I did ask the attendant who was at the garage, who told me that yes, it's-sometimes it's full, sometimes it's not. He wasn't very informative. I didn't speak to Grenadier management specifically.

(See VE Ex. 10 Deposition of Martin B. Levine, Thursday October 10, 2002, p. 53 lines 7–22)

Levine further testified that he based his garage occupancy estimates on a 1997 appraisal produced by his firm, KTR, wherein all five garages were reported occupied at between 70% and 80% capacity, totaling approximately 600 spaces, at $50 per space each month. (*Id.* p. 102) However, the occupancy of 600 parking spaces was never verified by anyone at KTR, nor did anyone from KTR visit the

garages in 1997 to verify if the spaces were actually utilized. (Tr. Nov. 8 p. 102)

In contrast, Von Ancken projects a more conservative increase in garage occupancy over the next few years. He estimates that, over the course of 4 years, a landlord can increase occupancy from 137 to 250 spaces, charging $90 per space each month. (VE App. I p. 50) Of the 200 spaces available in each garage, Von Ancken testified that in approximately 50 of those spaces "the posts are so close you can't fit a car in that area", thereby making approximately 20% of the 1000 available spaces in all five garages unusable, and limiting the total amount of usable spaces to 750. (Tr. Nov. 26 p. 133) Therefore, even if this Court were to find Levine's estimate, that all five garages will be occupied at between 70% and 80% capacity to be reasonable, the garage occupancy at Vanderveer would be actually closer to 525 spaces, or approximately 70% of 750 spaces, rather than the 800 spaces projected by Levine. This Court finds that VE's projection that garage occupancy at Vanderveer will increase from 137 spaces to 250 spaces, over a four-year period, at a rent of $90 per space, almost twice the rent estimated by Debtor, to be a reasonable assumption, especially taking into account the fact that, although 20% of the currently occupied spaces are actually rented for $45 per space, Von Ancken estimated the higher rent of $90 per space for all spaces. (Tr. Nov. 26 p. 148)

### 2. *Repair Costs*

Although both VE and Debtor have allocated certain sums for repairs, maintenance and improvements of the elevators, entryway doors and intercom systems at Vanderveer, the sums allocated differ substantially. Debtor relied on the property condition report prepared by Building Diagnostic, Ltd., a firm of consulting engi-

neers, dated January 12, 2001 and the update dated July 22, 2002 (collectively "BDI Report") in estimating $1,168,250 in immediate repairs and $9,138,000 as a long-term maintenance and replacement reserve fund (Tr. Nov. 8 pp. 109–110; Debtor's Post–Trial Brief on Valuation p. 18, ¶ 40; Debtor Ex. "G") Essentially, Debtor contends that the various items at issue, such as the elevators, entry doors and intercom systems, need only to be repaired and maintained, rather than replaced. (Debtor's Post Trial Brief on Valuation pp. 19–21) Debtor offered expert testimony by a representative of BDI, Donald Hibbard, who is a licensed engineer, to support this assumption. For example, Hibbard testified that although initially, in the 1997 BDI inspection, all 12 boilers had been found to be in "fair to poor" condition, the renovation work had been completed, and in the updated report of June 2001, they were reported to be operational. (Tr. Nov. 26 pp. 18–19) In addition, Hibbard testified that the intercom systems and the doorways, although not in very good condition, constituted a maintenance problem and should not be altogether replaced. (Id. p. 10) Hibbard blamed the poor condition of these items on the high vandalism rate at Vanderveer, and explained that, even if these items were replaced, they would quickly be damaged in any event. (Id. pp. 20–21) The elevators, although in poor condition due to vandalism, similarly only showed relatively minor functional problems, such as incorrect "leveling" which would constitute a maintenance, not a replacement, issue. (Id. pp. 17–18) Hibbard testified that the condition of the Property, in general, was "equal or better" in his 2002 updated re-

port than in the 1997 report, and the amount needed for immediate work had decreased from approximately $3.6 million to approximately $1.1 million. (Id. pp. 21–22)

VE, on the other hand, contends that approximately $5 million is necessary for immediate repairs, and approximately $6.5 million is necessary for both mid-term (3–5 years) and long-term (6–10 years) replacement reserves and maintenance.[8] (VE App. I p. 60; Tr. Nov. 26 pp. 161–162)

Although the overall amounts estimated by the two appraisers for repairs and maintenance are almost the same, VE contends that immediate replacement of certain items (such as all 59 elevators) is needed, whereas Debtor allocates most of the funds for long-term maintenance. VE contends that Levine should have obtained a recent report of the elevator outage at Vanderveer, which indicated that 1–11 elevators were not operational on any given day. (VE's Post–Trial Memo p. 27) However, as Hibbard testified, the problems with the elevators were mainly associated with relatively minor functional problems such as improper "leveling."

This Court agrees with Debtor's conclusion that most of the funds should be reserved for maintenance and repairs rather than immediate, full replacement. In reaching this determination, this Court is influenced by the fact that the Debtor's assumption in this regard is based upon an investigation and report by a consulting engineer, while VE's appraiser did not base his assumption on any comparable expert opinion. For the purposes of this valuation, this Court adopts Debtor's estimate that $1,168,250 is sufficient for imme-

---

8. At trial, Von Ancken testified that he "computed the present worth" of the $11,290,000 to be approximately $10,600,000 and "took half of that number at five million dollars" in reserve for long-term repairs and deferred maintenance and the other half, rounded off at $5 million dollars for immediate necessary repairs and capital improvements. (Tr. Nov. 26 pp. 161–162)

diate repairs and that approximately $9,138,000, or, on average $761,500 per year, should be allocated, over the course of 12 years, to long-term replacement funds rather than approximately $6,645,000 over a ten-year period, or, on average $664,500 per year, as VE contends. (Debtor App. III p. 74; VE App. II, p. 58)

■ After considering the testimony of all the witnesses, and considering the reasonableness of Debtor's assumptions concerning subsidized income available at Vanderveer, this Court declines to accept Debtor's valuation of the Property at $115,000,000. For purposes of this valuation, this Court adopts VE's analysis of value, pursuant to the discounted cash flow method. In addition, this Court finds VE's assumption that garage occupancy at Vanderveer will increase from 137 to 250 spaces, over the course of a four-year period, at $90 per space, to be reasonable. However, Debtor's assumption, based upon BDI's report and Hibbard's testimony, that $1,168,250 rather than $5,000,000 should be allocated for immediate repairs at Vanderveer, is reasonable and will be adopted for the purposes of this valuation. Furthermore, this Court finds the allocation of, on average, $761,500 per year for long-term structural and replacement reserves (consistent with the BDI Report, see Tr. Nov. 8 pp. 109–110) to be adequate and reasonable. Adoption of these assumptions concerning necessary reserves for immediate repairs and the funding of long-term replacement reserves results in a final estimated value of Vanderveer, using the discounted cash flow method and other assumptions employed by Van Anck-

en, as shown in the calculations in the Appendix below, of $78,902,062.

### Conclusion

For all of the foregoing reasons, this Court finds that the value of Vanderveer, for the purposes outlined herein, is approximately $78,902,062. VE is directed to settle an appropriate order.

### APPENDIX

*Calculation of Modification to Final Value of Vanderveer*

In order to arrive at a final value of Vanderveer reflecting the adoption of Debtor's estimate of $1,168,250 needed for immediate repairs and a further $761,500 per year allocated to fund replacement reserves, as determined above, the Court applied Von Ancken's discounted cash flow analysis as follows:

A. *Calculation of Modification to Net Operating Income (NOI) of VE App III*

First, the Court modified the Net Operating Income arrived at by Von Ancken in VE App. III for each year by subtracting $97,000 from the NOI each year from to reflect the difference between VE's allocation of expense for replacement reserves and Debtor's allocation of expense for this item.

The following table sets out the modified NOI for each year, assuming that $761,500 per year is allocated to replacement reserves instead of VE's allocation of, on average, $664,500 per year for replacement reserves.[1]

---

1. This Court arrived at an average replacement reserve expense of $761,500 per year by dividing $9,138,000 over 12 years, in accordance with the BDI Report, as Levine testified he did. (Tr. Nov. 8 pp. 109–110) In calculat-

ing the difference between this amount and the replacement reserve used by Von Ancken, this Court arrived at an average annual replacement reserve expense of $664,500 for

*Net Operating Income Table*

| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|
| $9,502,596 | $9,037,920 | $8,134,011 | $7,002,652 | $7,192,696 | $7,387,523 |

| Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | |
|---|---|---|---|---|---|
| $7,587,241 | $7,791,957 | $8,001,783 | $8,216,829 | $8,534,210 | |

B. *Calculation of the Present Value (PV) of a 10 year Cash Flow*

Second, the Court applied a discounted cash flow analysis, projected over a ten-year period, to determine what the present value of future cash flows generated by the modified NOI at Vanderveer, as calculated in Section B above, would be. "Discounting" is a procedure used to convert cash flows and reversions into present value; based on the concept that benefits received in the future are worth less than the same benefits received today. See "The Appraisal of Real Estate", at p. 550 (12th Ed.2001) As "The Appraisal of Real Estate" explains, "a future payment is discounted to present value by calculating the amount that, if invested today, would grow with compound interest at a satisfactory rate to equal the future payment." ("The Appraisal of Real Estate" at pp. 550–511) The standard formula for discounting future value to present value is:

$$\text{Present value} = \frac{\text{Future Value}}{(1 + i)^n}$$

where $i$ is the rate of return on capital per period (or the discount rate) that will satisfy the investor and $n$ is the number of periods that the payment will be deferred. ("The Appraisal of Real Estate", at p. 551) If a series of future payments is expected (as in the instant case), each payment is discounted with the standard formula, and the present value of the payments is the sum of all the present values. The yield formula is expressed as:

$$PV = \frac{CF}{1 + Y} + \frac{CF_2}{(1 + Y)^2} + \frac{CF_3}{(1 + Y)^3} + \ldots + \frac{CF_n}{(1 + Y)^n}$$

where $PV$ = present value; $CF$ = the cash flow for the period specified; $Y$ = the appropriate period yield rate; and $n$ = the number of periods in the projection. (*Id.*)

Using the above yield formula, this Court calculated the present value of the projected ten-year cash flow of Vanderveer, incorporating the modified NOI as calculated in Section B, and using a discount rate of 11.5%, as did Von Ancken in VE App. III., as expressed in the following formula:

$$PV = \frac{\$9,502,596}{1 + 11.5\%} + \frac{\$9,037,920}{(1 + 11.5\%)^2} + \frac{\$8,134,011}{(1 + 11.5\%)^3} + \ldots + \frac{\$8,216,829}{(1 + 11.5\%)^{10}}$$

By calculating the present value of the proposed cash flow for each separate year,

Von Ancken by dividing $6,645,000 over 10 years. (See VE App. II, p. 58)

and then adding them all together, pursuant to the above *PV* formula, this Court arrives at an estimated *PV* of a 10–year cash flow of $46,782,319. The following table shows the present value of the modified NOI for each year:

*PV of a 10–year discounted cash flow*

| Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 |
|---|---|---|---|---|---|
| $8,522,507 | $7,271,053 | $5,868,694 | $4,529,529 | $4,174,518 | $3,843,664 |
| Year 7 | Year 8 | Year 9 | Year 10 | | |
| $3,540,476 | $3,261,597 | $3,003,672 | $2,766,609 | | |

### C. Calculation of Reversion Value of the Property

Income-producing properties, such as Vanderveer, provide two types of financial benefits to the investor, which are added together to arrive at a final value of the property: 1) the periodic income or the present value of the cash flow generated from the property (as calculated in Section B above) and 2) the future value obtained from a hypothetical sale of the property at the end of the holding period (at the end of the 10–year projection period), otherwise known as the reversion value. ("The Appraisal of Real Estate", at pp. 556–557) In order to estimate a property reversion, appraisers typically use a capitalization rate, the "terminal capitalization rate" to convert income the NOI of the property for the year following the last year in the forecast period (which would be the 11th year in the present model)into an indication of the anticipated value of the property at the end of the holding period. ("The Appraisal of Real Estate", at p. 557) In essence, the terminal capitalization rate is used to determine the resale value of the property using direct capitalization, using the following standard formula:

Reversion Value = $\dfrac{\text{Net Operating Income}}{\text{Terminal Cap. Rate}}$

("The Appraisal of Real Estate", at p. 557 and p. 530)

After calculating the reversion of the property, the appraiser will typically deduct the selling expense of the property (the transaction costs) to arrive at the net proceeds of the hypothetical resale. ("The Appraisal of Real Estate", at p. 557) The reversion is often a major portion of the total benefit to be received from an investment in income-producing property. ("The Appraisal of Real Estate", at p. 557) In the present case, the Court applied a terminal capitalization rate of 9.5% (as used by Von Ancken in VE App. III) to the projected NOI of the 11th year, which was estimated to be $8,534,210 to arrive at a gross reversion of approximately $89,833,789. This equation is expressed as:

Gross Reversion = $\dfrac{\$8,534,210}{9.5\%}$ = 89,833,789

Next, the Court deducted Von Ancken's transaction costs of 4.25% from the gross reversion to arrive at the net proceeds of the hypothetical resale of Vanderveer in the 10th year of approximately $86,015,853. Next, in order to determine what the present value of this reversion is, the Court simply applied the present value formula, as expressed in Section B, to the reversion of $86,015,853 as shown below:

580

$$PV \text{ of Reversion} = \frac{\$86,015,853}{(1 + 11.5\%)^{10}}$$

Using the above formula, the Court arrived at a present value of the reversion (*PV* of Reversion) of approximately $28,961,566.

### D. *Calculation of Final Value*

Von Ancken explained at trial that he took into account both the present value of the income stream generated by Vanderveer, as well as the present value of the reversion of Vanderveer derived from a hypothetical sale of Vanderveer in the 10th year, and added these values together to arrive at a final value. (Tr. Nov. 26 pp. 155–161) Using this method, this Court arrived at a value of Vanderveer of approximately $75,743,885, as expressed in the formula below:

> Total Present Value = Present Value of Reversion + Present Value of a 10–year cash flow where Present Value of Reversion is estimated at $28,961,566 and the Present Value of a 10–year cash flow is estimated at $46,782,319.

In order to arrive at the final value of Vanderveer, the Court then deducted the immediate necessary repair costs, in the amount of $1,168,250, from the Total Present Value and added the Present Value of the J–51 Tax Benefits, in the amount of $4,326,427, as Von Ancken did in his final valuation. (Tr. Nov. 26 pp. 160–162, VE App. III, p. 2) In this way, the Court arrived at an estimated final value of the Property of $78,902,062.